RONALD E. MORGAN AND CAROL L. MORGAN, Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent
Morgan v. Commissioner
Docket No. 3296-77.
United States Tax Court
T.C. Memo 1978-401; 1978 Tax Ct. Memo LEXIS 113; 37 T.C.M. (CCH) 1661; T.C.M. (RIA) 78401; October 5, 1978, Filed Peter R. Stromer and Norma R. Bell, for the petitioners. Peter D. Bakutes and James M. Kamman, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $ 1,316.45 in petitioners' Federal income tax for the year 1974. Concessions have been made by the parties. The issues remaining for decision are: (1) Whether income received by petitioner-husband for sales commissions and management services is taxable to him or to a" family trust" purportedly created by petitioners; and (2) Whether $ 1,750 paid in 1974 for materials *116 used to create the "family trust" is properly deductible by petitioners under section 212[1] or section 162. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioners Ronald E. Morgan (hereinafter Ronald) and Carol L. Morgan (hereinafter Carol) resided in Missoula, Montana, at the time they filed their petition in this case. They filed a joint Federal income tax return for 1974 with the Internal Revenue Service Center, Ogden, Utah. In February 1974, Ronald was employed by Executive PontiacCadillac, (hereinafter Executive), Missoula, Montana, as a new and used automobile salesman. His duties there included demonstrating and merchandising automobiles, answering customer inquiries, preparing documents with respect to sales of automobiles and closing sales made by him or made by other automobile salesmen. As a salesman at Executive, Ronald received a predetermined percentage, usually 25-30 percent, of the gross profit *117 realized by Executive on every vehicle he sold. On some occasions Ronald served as acting sales manager at Executive in the absence of the regular sales manager during which time he supervised other automobile salesmen and verified completion of their work in addition to his normal duties as an automobile salesman. As acting sales manager Ronald was paid $ 50 to $ 75 per day by Executive, in addition to commissions on automobiles sold by him. Executive paid the sum of $ 4,480.30 to Ronald between January 1, 1974, and May 14, 1974, as commissions and other remuneration, which amount was included in gross income by petitioners on their 1974 joint Federal income tax return. On April 20, 1974, Ronald paid the sum of $ 1,750 to Educational Scientific Publishers (hereinafter ESP) for certain written materials (hereinafter the materials). On their 1974 joint Federal income tax return petitioners claimed a deduction for the $ 1,750 under "miscellaneous deductions" with the following explanation: Endowment paid to Educational and Scientific Publishers (A Trust), Denver, Colo.; for the management, conservation or maintenance of property held for the production of income ( I.R.C. Sec. 212 *118 ). This deduction was disallowed in full by respondent in his statutory notice of deficiency. The materials purchased from ESP included a document entitled "Declaration of Trust of This Pure Trust" (hereinafter the Declaration). The Declaration consisted of eight pre-printed pages with six blank spaces for the insertion of names, two blank spaces for the insertion of an address, nine blank spaces for the insertion of the word "his" or "her", three blank spaces for signatures of the "grantor-creator" and "trustees", and notarization section. The materials included instructions for completion and use of the documents included in the materials. Pursuant to the instructions, Ronald and Carol filled in the blank spaces in the Declaration, and on May 13, 1974, Ronald as grantor-creator and Carol and one Sheral M. Lantz (hereinafter Sheral) as trustees subscribed the Declaration and created a trust instrument entitled the Ronald E. Morgan Family Estate (A Trust) (hereinafter the Trust). The document was received and filed by the Missoula County Recorder on May 14, 1974. The trust instrument provides, in part, as follows: TRUSTEES' DECLARATION OF PURPOSE OF THIS EXPRESS EQUITY *119 PURE TRUST THE DECLARED PURPOSE OF THE TRUSTEES OF THIS TRUST shall be to accept rights, title and interst in and to real and personal properties, whether tangible or intangible, conveyed by THE CREATOR HEREOF AND GRANTOR HERETO to be the corpus of THIS TRUST. Included therein is the exclusive use of his lifetime services and ALL of his EARNED REMUNERATION ACCRUING THEREFROM, from any current source whatsoever, so that RONALD E. MORGAN can maximize his lifetime efforts through the utlization of his Constitutional Rights; for the protection of his family in the pursuit of his happiness through his desire to promote the general welfare, all of which RONALD E. MORGAN feels he will achieve because they are sustained by his RELIGIOUS BELIEFS. * * *
POERS OF TRUSTEES
Trustees may do anything any individual may legally do in any state or country, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of THIS TRUST, such as, viz: buy, sell *120 or lease land for the surface or mineral rights; buy or sell mortages, securities, bonds, notes, leases of all kinds, contracts or credits of any form, patents, trademarks, or copyrights; buy, sell or conduct m1i3-order business, or branches thereof; operate stores, shops, factories, warehouses or other trading establishments or places of business of any kind; construct, buy, sell, lease or rent suitable buildings or other places of business; advertise different articles or business projects; borrow money for any business project, pleding The Trust property for the payment thereof; hypothecate assets, property, or both, of The Trust in business projects; own stock in, or entire charters of corporations, or other such properties, companies, or associations as they may deem advantageous. * * *
PURPORT The purport of this instrument is to convey property to Trustees, to constitute a Trust (Estate) for the benefit of the beneficiaries, held by the Trustees, in Trust and in joint tenancy for the duration hereof, and to provide for a prudent and economical administration by natural persons acting in a fiduciary capacity, to BEGIN AT ONCE and not to be deferred until after the death *121 of any creator, settlor or maker, as occurs when such Trust Estates are created by Last Will and Testament, the settlors, creators or makers of this convenant preferring that The Trustees act solely within their constitutional rights as based upon their common law rights and immunities vouchsafed to citizens of the United States of America and defined in Article IV, Section 2, PROVIDING, that "Citizens of each state shall be entitled to all privileges and immunities of citizens in the several states," and Article VI, Section 2, PROVIDING, that "The Constitution of the United States and the laws made in pursuance thereof shall be the supreme law of the land;" and the 14th Amendment thereof, PROVIDING, that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The administration of THIS TRUST shall be amenable to judicial regulation on occasion arising and under the paternalism and protection of the court. Citations applicable and various rulings pertaining to Trust Estates and constitutional rights of contract and collective bargaining (except copartnership relationship, which is not applicable) may be found in case *122 law which is applicable. Nothing herein contained shall be construed as an intent to evade or contravene any Federal or State Law, nor to delegate to Trustees any special power belonging exclusively to franchise of incorporation. The intent of the Creator of THIS TRUST is to Grant to it certain real and personal properties and in so doing conveys all right, title and interest therein. By creating this Legal Entity, The Grantor-Creator of THIS TRUST has exercised his Constitutional Rights. * * *
CERTIFICATES OF BENEFICIAL INTEREST The Beneficial Interests, as a convenience, for distribution are divided into One Hundred (100) Units, substantially in the certificate form hereto attached. They are non-assessable, non-taxable (under the provisions of Section 1002 of Internal Revenue Code), non-negotiable but transferable; and the lwful possessor thereof shall be construed the true and lawful owner thereof. The lawful owner may, if he so desires, cause his Beneficial Certificate to be registered with the Secretary of the Trustees. * * *
DURATION-CLOSURE This Trust shall continue for a period of twenty-five years from date, unless The *123 Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason necessary to protect or conserve trust assets, liquidate the assets, distribute and close The Trust at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner distributed to the beneficiaries. In the event this instrument has been recorded with the Register of Deeds, they shall then file with said Recorder a notice that The Trust shall terminate and cease; and thereupon, The Trustees shall automatically be discharged hereunder, PROVIDED, their administration and distribution have been made in accordance with the terms and provisions of THIS TRUST Indenture. Otherwise, a court of equity may be invoked to review and correct any tort or error. The materials also included twelve pre-printed pages, with blank spaces for names, dates and other information (hereinafter the twelve pages). The twelve pages served as an outline for meetings of the Board of Trustees. The first few of these twelve pages, dated May 13, 1974, provided the material, in part, to unanimously *124 affirm the creation of the trust and to convey Ronald's rights, title and interest in the exclusive use of his lifetime services, including all earned remuneration accruing from any current source. Ronald and Carol were also established as lifetime trustees and the trust was designated as an educational trust. Within the twelve pages was a second grouping, dated May 29, 1974, in which the Trust issued the total 100 units of "beneficial interest" (hereinafter the units) to Ronald. On the same date Ronald returned his units and 50 units were issued to Ronald and 50 units to Carol. Ronald then surrendered 10 units to each of their four children. These certificates of interest conveyed no interest in the trust assets and no voice in the management or control of the trust. They conveyed only a right to receive a pro rata share of any "emoluments" distributed at the discretion of a majority of the trustees. There is no indication in the record of any distribution of income made to the beneficiaries in 1974. Also at this point Ronald and Carol were named as executive trustee and secretary, respectively. Subsequent documents signed by the trustees provided for an annual salary *125 of $ 7,800 to Ronald and $ 1,800 to Carol, a house for their use purchased in the Trust's name, a trustee appointment to Carol's mother, Verna, and the surrender and reissuance of Ronald's 10 units to Verna. In May 1974 Ronald and Carol executed documents assigning their lifetime services to the Trust and conveying to the Trust all their household furnishings and furniture, tools, jewelry, insurance policies and other miscellaneous items. In their capacity as trustees they also entered into an employment agreement in May 1974 with Ronald's employer, Executive, through its office manager, Jack R. Stelling, to pay all of Ronald's remuneration and assign his employment benefits to the Trust. Prior to signing the agreement Executive did not consult an attorney. Mr. Stelling subsequently consulted someone at the Internal Revenue Service concerning the validity of the agreement for Federal tax purposes who stated in effect that the Internal Revenue Service did not recognize this type of family trust. The operation of Executive did not undergo any substantial change after execution of the agreement. Executive continued to pay the same rate of compensation, to provide the same *126 fringe benefits for Ronald's services at Executive, and to include his name on the roster Executive posted for the days of duty for each of its salesmen just as it has prior to the execution of the agreement. Ronald's duties and responsibilities at Executive were the same after the agreement as those existing before he signed the agreement. Ronald's relationship with his customers at Executive was similarly unchanged after execution of the agreement. He continued to use business cards bearing the name "Ronald E. Morgan" as an automobile salesman at Executive. He mailed thank you notes to customers with whom he dealt at Executive subsequent to the agreement and signed such notes "Ron Morgan". Ronald did not enter into any agreement with the Trust which obligated him to earn a minimum amount of income for the Trust, to work any specified hours for the Trust or to perform services on behalf of the Trust in a particular manner. Between May 14, 1974, and December 31, 1974, Executive issued payroll checks which totaled $ 9,171.70 made payable to the Trust for a sales commission earned on vehicles Ronald sold in 1974. The $ 9,171.70 was deposited to the trust account and was *127 not included by petitioners in their gross income on their 1974 joint Federal income tax return. In the notice of deficiency respondent determined that this $ 9,171.70 was includable in petitioners' 1974 gross income. In 1974 Ronald sold a tractor dozer for one Monty Kammerzell and received $ 1,250 from him as a sales commission. Also during 1974, Subaru Inc., Portland, Oregon, (hereinafter Subaru) paid Ronald $ 120 for a special promotional commission for the sales by Ronald of a Subaru automobile. Petitioners did not include either the $ 1,250 from Mr. Kammerzell or the $ 120 from Subaru in gross income on their 1974 joint Federal income tax return. In the notice of deficiency respondent determined that both sums were includable in their 1974 gross income. The Trust maintained a bank checking account (hereinafter the trust account) separate from petitioners' personal bank checking account. Only Ronald and Carol were authorized to write checks against the trust account. The only sources of funds deposited to the trust account in 1974 were the $ 9,171.70 from Executive for sales commissions to Ronald, payments from Executive for Ronald's periodic services as acting sales manager, *128 and the $ 1,250 and $ 120 sales commissions to Ronald from Mr. Kammerzell and Subaru, respectively. OPINION The first issue is whether petitioners can transfer the tax burden on compensation paid to Ronald to a family trust because Ronald had conveyed his lifetime services to the Trust. Petitioners argue that services after the conveyance are properly paid to the Trust, and, thereafter, are not includable in their gross income. Respondent, on the other hand, contends that the amounts of income in dispute are properly includable in petitioners' gross income under section 61 regardless of contractual obligations concerning the disposition of earnings because the purported conveyance of lifetime services is an anticipatory assignment of income or, in the alternative, is within the definition of gross income as governed by sections 671 through 677, inclusive. We agree with respondent.
A tenet of long standing is the principle that income is taxed to the one who earns it. Commissioner v. Culbertson,337 U.S. 733, 739-740 (1949). Attempts to thwart this maxim by diverting *129 income from the one who earns it to another individual or to an entity by means of contractual agreements, however skillfully created, are not recognized as dispositive for Federal income tax purposes despite their validity under applicable state law. Lucas v. Earl,281 U.S. 111 (1930); Gregory v. Helvering,293 U.S. 465 (1935); United States v. Basye,410 U.S. 441 (1973). Moreover, the person or entity which in fact controls the earning of the income, rather than the income itself, is considered the recipient of such income [2] for Federal tax purposes. American Savings Bank v. Commissioner,56 T.C. 828, 838-839 (1971); Wesenberg v. Commissioner,69 T.C. 1005 (1978). *130 Petitioners argue that they are agents of the family trust, that Ronald was employed under contractual agreement as an independent contractor and, as a result, the income from his personal services is properly taxable to the trust. After examination of all the evidence, however, we are convinced that it was Ronald, and not the Trust, who controlled the earning of the amounts in dispute. Several factors lead us to this conclusion. First, the documents concerning conveyance give the Trust no rights to direct Ronald's activities and the record shows that it was Executive, not the Trust, which provided the daily supervision of Ronald's activities. See Wesenberg v. Commissioner, supra; Morrison v. Commissioner, 54 T.C. 758 (1970). Executive determined Ronald's remuneration, employment duties and work schedule in the same manner after the creation of the Trust and the employment agreement as before. A former officer and sales manager of Executive testified that it was Ronald's services the company sought to retain and not those of the Trust. Second, Ronald had no legal duty to earn money or perform services for the Trust. His only obligation *131 under the trust documents was to relinquish to the Trust all income earned by him. Cf. Jones v. Commissioner, 64 T.C. 1066 (1975); American Savings Bank v. Commissioner, supra. Moreover, even if the Trust had specified duties and remuneration, we agree with the statement in Wesenberg that it is questionable whether the Trust could obligate Ronald to perform services which were inherently personal to him in nature. Consequently, the conveyance of lifetime services and the actual performance of personal services was an attempted assignment of income ineffective to shift the incidence of taxation. Petitioners attempt to bolster the validity of the Trust by pointing to Executive's actions by recognizing the Trust in the employment agreement, by making Ronald's payroll checks payable to the Trust, and by not withholding income taxes and other amounts from the payroll checks. Actions by Executive do not control our decision and in essence beg the question. The issue here focuses on who continued to control the earnings in dispute. It is immaterial for Federal income tax purposes whether an employer chooses to honor an employee's request *132 that his earnings be paid to a third party. There is also no merit in the claim by petitioners that Ronald has a constitutionally protected right to dispose of his property (including his labor) in whatever manner he sees fit. Petitioners miss the point. The issue is not whether Ronald has the right to sell his services to the employer of his choice, but rather whether, for Federal tax purposes, this is an anticipatory assignment of income. Similarly, nothing in the record suggests that the Trust was involved at all in Ronald's relationship with Mr. Kammerzell and Subaru. These sums of $ 1,250 and $ 125, respectively, were paid directly to Ronald for personal services performed by him, and we find that he controlled earnings in the same manner as he controlled his earnings of commission income prior to the creation of the Trust. Consequently, these sums are also includable in petitioners' gross income for 1974. This case shares the same outcome as three other cases recently decided by this Court concerning the purported establishment of family trusts. See Wesenberg v. Commissioner, supra; Horvat v. Commissioner, T.C. Memo. 1977-104, *133 affd. per curiam by unpublished order (7th Cir., June 7, 1978); and Damm v. Commissioner, T.C. Memo. 1977-194. Petitioners in all of these cases attempted to rely upon similar constitutional, state law and agency arguments to convey an individual's personal services to a family trust by means of a series of blueprints tailored to the individual merely by filling in the appropriate blanks in a fruitless effort to circumvent personal income taxation. The trust language, which assigns any present or future income, makes it abundantly clear that the personal services and business activities are under the control and direction of the taxpayers themselves and not the trust. The distinction is aptly stated in the Horvat case: Petitioners herein have conceptually failed to perceive the difference, albeit at times slight, between the anticipatory assignment of income to some other entity and the performance of substantial services by an entity through its agents or employees. Accordingly, we hold that the amounts paid to Ronald in return for his services were includable in income and should have been so reported. In light of our finding that the assignment of income *134 doctrine prevails, we find it unnecessary to discuss respondent's alternative position. The second issue concerns whether the sum of $ 1,750 paid in 1974 for documentary materials utilized to establish the family trust in this case is properly deductible by petitioners under section 162 or section 212. These materials consist of a 25-page article by an attorney, P. Marshall Boyls, explaining the characteristics of the "pure equity trust", various instructions and certain boilerplate forms to be used in creating a "pure equity trust". Respondent has disallowed this deduction in his statutory notice of deficiency and petitioners have the burden of proving their entitlement to this deduction. Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioners contend that the $ 1,750 is deductible as an expense either under section 212(1) for the production or collection of income, under section 212(2) for the management, conservation or maintenance of property held for income, under section 212(3) for the determination of a tax, or under section 162 as educational expenses both to maintain or improve skills required in their trade or business and to meet express requirements *135 to retain employment. A section 212(1) deduction for the production or collection of income applies only to expenditures made for the production or collection of taxable income. Section 1.212-1(a)(1), Income Tax Regs. In the instant case the $ 1,750 was paid to change the manner in which title to petitioners' property was held, that is, by the Trust rather than by petitioners, and not to create a new source of taxable income or to collect earned but unrealized income. Indeed, the only income resulting from the creation of the Trust was listed as a consultant's fee from the Trust, an amount which was nothing more than income from Executive, Mr. Kammerzell and Subaru diverted by Ronald by way of the trust account. A section 212(2) deduction is for amounts expended for the management, conservation or maintenance of income producing property. None of the property transferred to the Trust by petitioners produced, or was intended to produce, income taxable to petitioners. *136 Compare Merians v. Commissioner, 60 T.C. 187 (1973), Cobb v. Commissioner, 10 T.C. 380 (1948), affd. 173 F.2d 711 (6th Cir. 1949). With respect to the section 212(3) deduction for expenses paid for the determination of a tax, petitioners would have us find that since their primary, if not the sole, purpose for creating the Trust was to reduce their Federal income tax liability, the amount is deductible. The record, however, clearly establishes that the disputed amount was paid for the purely personal objective of changing the form in which title to petitioners' property was held and as such is a nondeductible expenditure under section 262. Petitioners' reliance on Merians v. Commissioner, supra, is also misplaced. There the Court determined that 20 percent of a fee was paid for tax advice and allowed a deduction under section 212(3) for that portion, whereas in this case the record is silent as to what portion, if any, was paid for tax advice. Moreover, the parties have stipulated that the entire $ 1,750 was paid for the materials to create the family trust herein. We similarly reject petitioners' contention *137 that the $ 1,750 is deductible as an educational expense under section 162 and section 1.162-5(a), Income Tax Regs., because petitioners have not introduced any evidence to show (1) how the materials in question maintained or improved skills required in their income-producing activities, (2) the existence of any express employer education requirements or (3) how the ESP materials satisfied any education requirements. The record is silent as to the $ 1,750 except the parties' stipulation that this sum was paid to ESP to obtain the materials utilized by petitioners to create the Trust. We agree with respondent that petitioners' motivations in creating the Trust were purely personal and find, therefore, that the amount in dispute is a nondeductible personal expense. See and compare Johnston v. Commissioner, T.C. Memo. 1978-121, in which this Court disallowed a claimed deduction for amounts paid to ESP for materials used by the taxpayers to create a trust similar to this Trust. In summary, we conclude that the tax laws cannot be so easily circumvented by conceiving arrangements to transfer the exclusive use of lifetime services and the *138 resulting compensation to family trusts as described herein. The inescapable conclusion is that the taxpayers, not the family trusts, control the earning of income. Consequently, with regard to this case, the aggregate sum earned by Ronald from Executive, Subaru and Mr. Kammerzell is properly includable in petitioners' gross income for 1974. The Court also finds that the $ 1,750 paid for the materials to establish the Trust is a personal nondeductible expense. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated.↩
2. Thus, petitioners are misdirected in their assumption that because the validity of the Trust is determined by state law and because the Treasury will not recognize a trust deemed invalid under applicable state law that the obverse necessarily follows. It is not inconsistent with the principles of state law to deny the most favorable interpretation to the validity of a trust when the result effectively prevents the earnings from vesting to the one who earns it, irrespective of the grantor's intent. Lucas v. Earl,281 U.S. 111 (1930); see also Ketter v. Commissioner,70 T.C. No. 63 (1978) (Income taxed to taxpayers because trusts lacked sufficient dominion and control over the partnership interests to be recognized as partners); and Evans v. Commissioner,54 T.C. 40↩ (1970) (Taxpayer was no longer a partner for Federal tax purposes despite the fact that for state tax purposes he remained a partner).