DANIEL W. COLE and CAROLYN O. COLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cole v. Comm'r
Docket No. 12698-78. United States Tax Court
T.C. Memo 1981-48; 1981 Tax Ct. Memo LEXIS 697; 41 T.C.M. (CCH) 820; T.C.M. (RIA) 81048; February 9, 1981. Donald B. Brown, for the petitioners. Peter D. Bakutes, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a deficiency in petitioners' 1975 income tax of $ 5,773, plus an addition to tax for negligence under section 6653(a) [1] of $ 288.65. The issues for decision are: 1. Whether the purported conveyance by petitioner Daniel W. Cole of his lifetime services to a family trust effectively shifted the incidence of taxation on compensation paid to him but transferred *699 to the trust. 2. Whether income reported by the trust is taxable to petitioners under sections 671 through 677. 3. Whether petitioners are entitled to deduct the expenses of setting up the trust under section 212. 4. Whether petitioners are liable for an addition to tax for negligence under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Daniel W. and Carolyn O. Cole, husband and wife, resided in Grants Pass, Oregon, at the time they filed their petition in this case. Daniel is a heavy equipment operator particularly skilled in the operation of heavy equipment in hazardous situations including the operation of tower cranes from great heights and the operation of bulldozers on steep hillsides. On April 9, 1975, Daniel created the Daniel W. Cole Estate (A Trust) (hereinafter referred to as the "Trust"). [2] In the declaration of trust Daniel named Carolyn and Louise G. O'Keefe (Carolyn's mother) as trustees of the Trust. Almost immediately following creation of the Trustee petitioner also became a trustee of the Trust. *700 The purpose of the Trust, as set forth in the declaration of trust, was to accept real and personal properties conveyed to it by Daniel, including the use of his lifetime services and remuneration therefrom. This transfer was made to enable Daniel to "maximize his lifetime efforts through the utilization of his Constitutional rights * * *." The Trust was to be administered by its trustees, with a majority vote of the trustees required for expenditures (including compensation of the trustees). The Trust was established for a period of 25 years; however, at their discretion and by unanimous vote, the trustees could liquidate the Trust at any time "because of threatened depreciation in values, or other good and sufficient reason * * *." Upon liquidation, the assets of the Trust were to be distributed to its beneficiaries. Prior to creation of the Trust, Carolyn transferred all of her property to Daniel with the understanding that the property would later be conveyed to the Trust and that Carolyn would eventually receive beneficial units in the Trust. Shortly after the creation of the Trust, Daniel executed a document purporting to convey to the Trust "[t]he Exclusive Use of *701 [Daniel's] lifetime services including ALL of his earned remuneration accruing therefrom from ANY current source whatsoever * * *." Daniel also purported to convey all of his and Carolyn's property (principally ordinary household goods) to the Trust. In return Daniel received all 100 units of benef cial ownership of the Trust. On April 10 and 11, 1975, Daniel made several transfers of his beneficial units in the Trust after which the following persons held the beneficial units in the Trust: Beneficial Units
Daniel W. Cole
10
Carolyn O. Cole
50
Daniel W. Cole, Jr.
20
Louise G. O'Keefe
20
100
Each certificate of beneficial interest stated that the benefits conveyed "consist solely of the emoluments as distributed by the action of The [sic] Trustees and nothing more." In 1975 the trustees opened a savings account and a checking account in the name of the Trust. All three trustees were authorized to write checks on the checking account. The funds in both accounts derived solely from Daniel's earnings subsequent to the creation of the Trust. The savings account earned $ 91 of interest in 1975. During 1975 the Trust purchased a 50 percent *702 interest in 39 acres of unimproved land near Grants Pass, Oregon. In 1976 the Trust built a house on this property which is presently used as petitioners' main residence. At a Trust meeting held on April 10, 1975, the trustees agreed that the Trust should provide Daniel and Carolyn with housing, transportation, health care insurance, reasonable monthly consultants' fees, and all other expenses incident to the Trust's business. Using the wages earned by Daniel as a heavy equipment operator, the Trust wrote checks covering the personal living expenses of petitioners such as rental expenses, utilities, stationery supplies, mortgage payments on the Grants Pass property, automobile expenses, and medical and dental expenses. Most of the trust documents described above do not vary in any significant manner from the trust documents used by taxpayers in numerous other cases which have already been before this Court. [3] Two documents, however, are somewhat unique. On April 10, 1975, Daniel and Carolyn executed separate documents acknowledging that "[t]he right to manage, use, control or profit from my services is a contract right * * *." Each petitioner then proceeded to transfer *703 his respective contract right to the trust. [4]
*704 During 1975 Daniel worked for several employers as a heavy equipment operator. Daniel's employers refused his requests that they pay his wages to the Trust, and instead they paid Daniel directly. Daniel received a total of $ 31,473.26 as compensation for his services in 1975. On their joint income tax return petitioners included the $ 31,474.26 as income and claimed a $ 30,472 adjustment to gross income representing amounts received by Daniel subsequent to the creation of the Trust. In 1975 petitioners paid $ 1,750 to Educational Scientific Publishers (ESP) for (1) various written materials used by petitioners to create and operate the Trust; [5] (2) detailed written instructions for creation and operation of the Trust; and (3) verbal instructions and assistance from an ESP "educator" (in this case from John J. O'Keefe, Carolyn's father) on the creation and operation of the Trust. Petitioners deducted this amount on their 1975 income tax return as a "cost to maintain and conserve assets and or minimize taxes (IRC 212)." *705 In his notice of deficiency for 1975, respondent disallowed petitioners' $ 30,472 adjustment to their gross income and disallowed the $ 1,750 deduction representing the amount paid by petitioners to ESP. In addition, respondent increased petitioners' income under sections 671 to 677 by $ 91 for interest earned by the Trust on its savings account. Finally, respondent added an addition to petitioners' tax for negligence. OPINION The first issue is whether the purported conveyance by Daniel of his contract right to manage, use and control his lifetime services to the Trust effectively shifted the incidence of taxation on remuneration for his services to the Trust. Respondent contends that this purported conveyance constituted an anticipatory assignment of income and, therefore, petitioners must report this compensation in their gross income. We agree. Income must be taxed to the one who earns it. Commissioner v. Culbertson,337 U.S. 733, 739-740 (1949). Notwithstanding their validity under state law, contractual arrangements that are designed to deflect income away from the one who earns it are not recognized as determinative for federal income tax purposes. *706 Lucas v. Earl,281 U.S. 111 (1930). It does not matter whether the ultimate recipient of the diverted income is an individual or, as in this case, an entity such as a trust. See United States v. Basye,410 U.S. 441, 449 (1973). This case is another in the growing number of similar cases involving the transfer of lifetime services to a trust. [6] In all of the noted cases this Court agreed with respondent. We see no reason to reiterate the holdings in those decisions. Petitioners are aware of those cases but argue that their situation is different because they transferred a "contract right" to their lifetime services to the Trust whereas the taxpayers in the other cases transferred the services outright. We find no merit in this distinction. Taxpayers can neither transfer their lifetime services nor a contract right for their lifetime services to a trust and effectively shift the incidence of taxation on the remuneration for those services. Accordingly, respondent properly disallowed petitioners' $ 30,472 adjustment to their gross income. *707 The second issue is whether the interest income earned by the Trust from its savings account should have been reported by petitioners under sections 671 through 677. The application of these sections was fully explained in Wesenberg v. Commissioner,69 T.C. 1005 (1978). In brief, if the grantor of a trust retains certain powers, then for income tax purposes he is treated as the "owner" of the portion of the trust over which the powers extend. Several factors in this case indicate that Daniel retained total control over the Trust. First, none of Daniel's powers as trustee required the consent of an "adverse party." [7] Sec. 672(a); sec. 1.672(a)-1, Income Tax Regs. Second, Daniel had beneficial enjoyment of the trust corpus and income. Third, petitioner used the Trust for his own benefit. [8] Finally, the assets of the trust could revert to Daniel at any time. In light of these facts and our decision in Wesenberg,supra, we sustain respondent's determination on this issue. *708 The third issue is whether petitioners may deduct $ 1,750 of expenses incurred in setting up the trust under section 212. After a careful review of the entire record we conclude that petitioners purchased the ESP package solely for personal reasons. For the same reasons set forth in earlier cases, we find that the amount in question is a nondeductible personal expense. See Morgan v. Commissioner,37 T.C.M. 1661, 47 P-H Memo. T.C. par. 78,401 (1978); Johnston v. Commissioner,37 T.C.M. 544, 47 P-H Memo. T.C. par. 78,121 (1978). Finally, section 6653(a) provides for the imposition of a five percent addition to tax for negligence or intentional disregard of rules and regulations. Daniel testified that the nature of his job was extremely hazardous, that he created the trust to avoid probate and related death taxes, and that income taxes were only a secondary consideration. Daniel further testified, however, that he and Carolyn executed the documents transferring their contract rights because of concern "that the assignment of income wouldn't quite make the grade." Petitioners consulted a banker and an attorney to consider any suggestions they might *709 have regarding devices to protect Daniel's family in the event of his death. They did not, however, consult an attorney, banker or other qualified individual [9] regarding this drastic step whereby petitioners purported to convey all their future earnings and their property to a trust. We think petitioners were negligent and intentionally disregarded the tax laws. Petitioners have failed to prove otherwise. The addition to tax is sustained. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
2. The trust forms used by Daniel were prompted by Educational Scientific Publishers (ESP). John J. O'Keefe (Carolyn's father), worked for ESP. Other trust instruments packaged by ESP and similar to those in the present case have already been the subject of much of this Court's time. See, e.g.,Vercio v. Commissioner,73 T.C. 1246 (1980); Markosian v. Commissioner,73 T.C. 1235 (1980); Gran v. Commissioner,41 T.C.M. 565, 49 P-H Memo. T.C. par. 80,558 (1980); Corcoran v. Commissioner,41 T.C.M. 508, 49 P-H Memo. T.C. par. 80,546 (1980); Basham v. Commissioner,41 T.C.M. 505, 49 P-H Memo. T.C. par. 80,545 (1980); Antonelli v. Commissioner,41 T.C.M. 502, 49 P-H Memo. T.C. par. 80,544 (1980); Morgan v. Commissioner,37 T.C.M. 1661, 47 P-H Memo. T.C. par. 78,401 (1978); Johnston v. Commissioner,37 T.C.M. 544↩, 47 P-H Memo. T.C. par. 78,121 (1978).
3. See note 2, supra. See particularly, Vnuk v. Commissioner,38 T.C.M. 710, 48 P-H Memo. T.C. part. 79,164 (1979); Johnston v. Commissioner,supra;Damm v. Commissioner,36 T.C.M. 793↩, 46 P-H Memo. T.C. par. 77,194 (1977). 4. These documents provided: The right to manage, use, control or profit from my services is a contract right that I have under State and United States Constitutions. This contract right I do now transfer to the DANIEL W. COLE ESTATE (A TRUST)↩ Trust, which is a viable, active and significant entity whose lawful and business activities are separate and apart from my dominion and control. I do this for consideration by means of an exchange otherwise set forth in the trust instrument or declaration upon the creation of the Trust. As part of this exchange, bargain and transfer, the said Trust shall have the actual legal right to control, direct, and manage my services with respect to all my activities or efforts that would and will result in earnings. The said Trust has the right to lease out my services as would any other labor contractor. The said Trust has the right to cancel or terminate any employment activities with which I am or may be engaged. It is my legal duty to work where the trust directs me (as long as such work is lawful and not immoral). It is my legal duty to stop working where and when the Trust directs me. I have a legal duty to earn money or benefits for the Trust. The Trust, and not myself is the true earner of all such monies or emoluments, any failure on the part of the Trust to put my efforts to the highest and best use shall be the responsibility of the Trust and not any fault of mine. The Trust shall make a reasonable effort to directly negotiate the use of my services with others, but, in the event that proves futile, it is my duty to immediately pass through to the Trust as a mere nominee any and all articles, monies, emoluments or the like. Such emoluments are and always shall be the earnings of the Trust. The Trust shall carefully manage the use of my services for its benefit. Great care will be exercised by the Trust in evaluating the amount and manner of my employment, the conditions where I serve, the burden placed upon me, my health, my mental attitude, the impact of the work upon my family and the like. I am not to be subject to cruel nor unusual assignments. In return for these substantial services by the Trust, I will endeavor to work hard and efficiently. This will without doubt introduce a substantial change into my mental attitude and the direction of my life, but I accept it freely for reasons known only to me. Those reasons include far more than the savings of taxes.
5. Included among these materials were a declaration of trust, minutes of meetings of the trustees of the Trust, certificates reflecting ownership of units of beneficial interests in the Trust, a bill of sale for the conveyance of all property to the Trust, a lease agreement for the lease of vehicles to the Trust, receipt for property transferred to the Trust, bank resolution minutes for the establishment of bank accounts in the name of the Trust, and documents entitled "Agreement" to be entered into with employers recognizing the Trust's claim to remuneration for Daniel's services.↩
6. See notes 2 and 3, supra. See also Wesenberg v. Commissioner,69 T.C. 1005 (1978); Schulz v. Commissioner,41 T.C.M. 599, 49 P-H Memo. T.C. par. 80,568 (1980); Taylor v. Commissioner,41 T.C.M. 539, 49 P-H Memo. T.C. par. 80,552 (1980); Gudenschwager v. Commissioner,41 T.C.M. 98, 49 P-H Memo. T.C. par, 80,439 (1980); Wesel v. Commissioner,41 T.C.M. 94, 49 P-H Memo. T.C. par. 80,438 (1980); Taylor v. Commissioner,40 T.C.M. 966, 49 P-H Memo. T.C. par. 80,313 (1980); Dombrowski v. Commissioner,40 T.C.M. 697, 49 P-H Memo. T.C. par. 80,261 (1980); Dekutowski v. Commissioner,40 T.C.M. 695, 49 P-H Memo. T.C. par. 80,260 (1980); Woebbeking v. Commissioner,40 T.C.M. 693, 49 P-H Memo. T.C. par. 80,259 (1980); Horvat v. Commissioner,40 T.C.M. 724, 49 P-H Memo. T.C. par. 80,266 (1980); Mirenda v. Commissioner,40 T.C.M. 666, 49 P-H Memo. T.C. par. 80,252 (1980); Mullenaux v. Commissioner,38 T.C.M. 1150, 48 P-H Memo. T.C. par. 79,293 (1979); Nelis v. Commissioner,38 T.C.M. 161, 48 P-H Memo. T.C. par. 79,042 (1979); Damm v. Commissioner,36 T.C.M. 793, 46 P-H Memo. T.C. par. 77,194 (1977); Horvat v. Commissioner,36 T.C.M. 476, 46 P-H Memo. T.C. par. 77,104 (1977), affd. in an unpublished opinion (7th Cir., June 7, 1978), cert. denied 440 U.S. 959 (1979). See also, Rev. Rul. 80-321, 1980-48 I.R.B. 6; Schnee, Family Trusts: Tax Planning That Doesn't Work,↩ 119-11 Trusts & Estates 51 (November 1980).
7. Where it is likely that an income beneficiary will be subservient to the grantor's wishes, as is the case here with Carolyn and Louise G. O'Keefe (Carolyn's mother), those persons are not adverse parties. Vercio v. Commissioner,73 T.C. 1246, 1258↩ (1980). 8. Daniel used the trust to pay many of his personal expenses, including health, housing and transportation expenses.↩
9. Petitioners did consult with John J. O'Keefe, Carolyn's father, as to the tax consequences of the trust. There is no evidence establishing the qualifications of O'Keefe to advise petitioners in this regard, except that in rendering his advice he acted as an employee of ESP. We do not believe that reliance on any advice given by O'Keefe is sufficient to avoid the penalty provided under section 6653(a).↩